IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| KYLE ARMSTRONG and KYLE DILGER,<br><br>                    Plaintiffs,<br>v.<br><br>AMBER SABIN, BENJAMIN SABIN, KEVIN VAN TASSELL, and UINTAH BASIN HOLDINGS LIMITED LIABILITY PARTNERSHIP,<br>                    Defendants. | MEMORANDUM DECISION AND ORDER REGARDING THE VALUATION OF PLAINTIFFS' INTERESTS IN LIQUID NUTRA GROUP<br><br>District Judge Ted Stewart<br><br>Case No. 2:20-CV-261-TS-DAO |

Defendant Amber Sabin has elected to purchase Plaintiffs Kyle Armstrong and Kyle Dilger's interests in Liquid Herbals Manufacturing LLC d/b/a Liquid Nutra Group ("LNG") in lieu of dissolution. The parties were unable to agree on the value of Plaintiffs' interests, so the Court must determine the value under Utah Code Ann. § 48-3a-702(8).

## I.     FINDINGS OF FACT

After reviewing the evidence and the parties' arguments, the Court makes the following factual findings:

### A.  LNG's Beginnings

Plaintiffs are co-owners of Rejuvica Health, LLC ("Rejuvica"), a California company that sells herbal products.[1] Between 2014 and 2016, Rejuvica used Cedar Bear Naturales ("Cedar Bear") as its manufacturer.[2] Ms. Sabin worked at Cedar Bear and developed a relationship with

---

[1] Stipulated Facts, Docket No. 79 ¶¶ 1–2.

[2] *Id.* ¶ 3.

1

Plaintiffs.[3] In 2016, Ms. Sabin was fired from Cedar Bear, so Plaintiffs and Ms. Sabin started LNG to manufacture herbal products, including products for Rejuvica.[4] Ms. Sabin has a 40% interest and Plaintiffs each have a 30% interest in LNG.[5] In the beginning, LNG was funded with prepayments from Rejuvica and an American Express card that was personally guaranteed by Mr. Armstrong.[6]

Ms. Sabin acted as the Chief Operating Officer, Mr. Armstrong acted as the Chief Executive Officer, and Mr. Dilger acted as the Chief Financial Officer of LNG.[7] Ms. Sabin's husband, Defendant Benjamin Sabin, also worked for LNG from the beginning, but he did not have an ownership interest.[8] Ms. Sabin and Mr. Sabin worked full-time to get LNG up and running in Vernal, Utah while Plaintiffs lived and worked in California.[9]

B.   2016–2019

1.   Rejuvica Pricing and Payment Terms

From the beginning, LNG gave favorable pricing and payment terms to Rejuvica that it did not offer to its other customers. Specifically, LNG charged Rejuvica between $1.00 and $1.50 less per bottle than other customers.[10] This amounted to about a 15% to a 25% discount, depending on the products.[11] Rejuvica also only paid for the products after it received them,

---

[3] *Id.* ¶ 4.

[4] *Id.* ¶¶ 5–7.

[5] *Id.* ¶ 9.

[6] Hearing Tr. 15:22–16:4.

[7] Stipulated Facts, Docket No. 79 ¶¶ 10–12.

[8] *Id.* ¶ 13; Tr. 15:17–21.

[9] Tr. 13:12–23.

[10] Tr. 49:20–50:12.

[11] *See id.*

counted them, and received and reviewed the FDA documents.[12] All other customers paid half

down when they placed an order and paid the other half before the order shipped.[13]

### 2. Cedar Bear Liability

LNG hit a snag early on when Cedar Bear sued LNG in 2017 for allegedly

misappropriating trade secrets.[14] In January 2019, LNG agreed to a settlement with Cedar Bear.[15]

This created a hefty liability that LNG paid quarterly.

### 3. Ms. Sabin's Personal Expenses

Though Ms. Sabin and Mr. Sabin worked full-time for LNG,[16] they were not paid for the

first several months of operations.[17] During that time, Ms. Sabin used the company's American

Express card to pay for some of her personal expenses.[18] Within the first few months of

operations, Ms. Sabin charged the American Express card at TJ Maxx for clothes for her

children, and Mr. Dilger confronted Ms. Sabin about this charge.[19] They decided that Ms.

Sabin's personal expenses would be categorized as a loan she owed to LNG.[20] Chuck Pentilla,

LNG's controller at the time, categorized all of Ms. Sabin's personal expenses as a loan.[21] From

then on, Ms. Sabin would turn in receipts for personal expenses to Mr. Pentilla, and he would

---

[12] Tr. 332:13–17.

[13] Tr. 48:17–20.

[14] Tr. 397:21–398:7.

[15] Ex. 6, at 1.

[16] Stipulated Facts, Docket No. 79 ¶ 10.

[17] Tr. 16:19–22; 145:24–146:2; 308:16–309:6.

[18] Tr. 17:3–8, 20–24; 308:21–309:1; 309:18–20.

[19] Tr. 17:25–18:4; 135:22–136:5; 308:12–24.

[20] Tr. 309:4–5.

[21] Tr. 18:10–18; 309:2–5.

add them to her loan.[22] At the time, neither Plaintiff expressly prohibited or expressly permitted Ms. Sabin to continue to use company funds for personal expenses.[23]

In early 2017, Ms. Sabin began receiving a salary for her work at LNG.[24] Yet, Ms. Sabin continued to make some personal expenditures with the American Express card and added them to her loan.[25] In early 2018, Mr. Dilger had his brother, Keith Dilger, audit LNG's books prior to filing LNG's taxes.[26] Keith notified Mr. Dilger that Ms. Sabin had been adding to her loan throughout 2017 and the early part of 2018.[27] Ms. Sabin admitted that she had been charging personal expenses to the company card, and neither Plaintiff said that was not allowed.[28] Mr. Dilger simply implemented a new policy requiring LNG to have receipts for all expenses.[29]

Throughout 2018 and 2019, Ms. Sabin continued to charge personal expenses to LNG accounts. After Mr. Pentilla left LNG in May 2018, some of Ms. Sabin's personal expenses were improperly categorized as business expenses, but they were all documented in LNG's Quickbooks account. In 2020, Mr. Dilger confronted Ms. Sabin about her personal use of company money, so she recategorized her personal expenses, adding them to her loan.[30] Ms. Sabin's loan currently totals approximately $117,000.[31]

---

[22] Tr. 20:3–16.

[23] Tr. 137:1–3; 148:3–7.

[24] Tr. 311:10–20.

[25] Tr. 146:18–20.

[26] Tr. 21:2–4.

[27] Tr. 311:24–312:8.

[28] Ex. 4, at 1.

[29] *Id.*

[30] Tr. 158:24–160:1.

[31] Tr. 79:14–16.

4.   Other Spending

From 2016 through 2019, LNG made large charitable contributions, provided its

employees and clients with numerous perks, and spent a significant amount of money on local

advertising. Some of these expenses included $47,730 for charities,[32] $61,762 for Utah Jazz

season tickets for clients and employees,[33] $23,860 for employees to stay at the Little America

hotel in Salt Lake City,[34] $18,001 for gym memberships for employees,[35] $13,902 for Apple

products for employees,[36] $9,216 for sponsoring a local event,[37] and $8,624 for advertising in a

local magazine.[38] In general, Ms. Sabin made these spending decisions. There were no company

policies about such spending, but Plaintiffs believed these amounts were excessive.

In addition, the members agreed they could each take a company-sponsored vacation.

Ms. Sabin and Mr. Dilger took a trip to Hawaii, and Mr. Armstrong took a trip to New York.

These trips were personal in nature and paid for by LNG.[39]

5.   Uintah Basin Holdings Rental

In 2018 and 2019, LNG was actively looking for another building where it could expand

its operations.[40] Late in 2019, the Sabins found a new building that would work for LNG. They

leased the building through another company they co-owned called Uintah Basin Holdings,

---

[32] Tr. 31:5–21; 37:3–12; 39:8–16; 40:20–41:4.

[33] Tr. 34:19–35:22.

[34] Tr. 35:23–36:24.

[35] Tr. 38:3–21; 42:5–9.

[36] Tr. 38:22–39:7.

[37] Tr. 39:19–24.

[38] Tr. 39:25–40:4.

[39] Tr. 432:4–11.

[40] Tr. 324:16–325:7.

LLC.[41] In December 2019, Uintah Basin Holdings subleased the building to LNG.[42] LNG paid

Uintah Basin Holdings $10,000 a month for rent in December 2019 and January 2020,[43] which

was about $2,000 more per month than Uintah Basin Holdings owed to the building owner.[44]

The Sabins never informed Plaintiffs about their interests in Uintah Basin Holdings or its

relationship with LNG.[45]

6.   Kevin Van Tassell

LNG hired Kevin Van Tassell, Ms. Sabin's father, to be its controller in April 2019 to

help make the company profitable.[46] In early January 2020, Mr. Van Tassell prepared a draft

2020 budget for LNG.[47] This was LNG's first written budget.[48] The draft budget included actual

revenue and expenses from 2019 and estimated revenue and expenses for 2020.[49] For the

revenue estimates, Mr. Van Tassell relied partially on a 2020 sales projection provided by Mr.

Dilger, making changes he believed were reasonable.[50]

Some of the budgeted items like cost of goods, shipping, uniforms, and supplies

increased slightly from 2019 because of the expected growth.[51] However, the budget also

included some drastic changes. For instance, Mr. Van Tassell reduced the budgeted amount for

---

[41] Tr. 84:15–17.

[42] Tr. 83:13–85:6.

[43] Tr. 166:18–22.

[44] Tr. 167:11–18.

[45] Tr. 86:10–14.

[46] Tr. 238:23–24; 239:5–6, 16–21.

[47] Ex. 19; Tr. 240:18–20.

[48] Tr. 240:18–241:23.

[49] Ex. 19.

[50] Tr. 243:21–244:21.

[51] Ex. 19, at 2.

lab testing from 2019's actual cost of $153,142 to $18,000.[52] According to Mr. Van Tassell this was a result of his conversations with Ms. Sabin about requiring customers to provide their own testing.[53] Mr. Van Tassell budgeted $78,000 for advertising costs when LNG spent almost double that—$134,801—on advertising in 2019.[54] Mr. Van Tassell explained that the owners had been concerned about their spending on advertising.[55] Mr. Van Tassell also increased the rent costs significantly because LNG began renting a new building.[56] The repairs budget increased significantly so LNG could clean up the new building to prepare to operate there.[57]

Mr. Van Tassell also reduced some discretionary expenses. For example, LNG actually spent $160,000 on travel in 2019, but Mr. Van Tassell only budgeted $100,000 because he believed the owners would stop indulging in expensive company perks such as company-sponsored vacations.[58] Mr. Van Tassell also significantly reduced the meals and entertainment budget from $94,390 to $78,000.[59]

C.  2020

1. January–March 2020

Things began to fall apart in early 2020 when LNG did not have enough money to make all of its payments. In January, Mr. Dilger personally loaned LNG $70,000 to cover its

---

[52] *Id.*

[53] Tr. 245:22–246:8.

[54] Ex. 19, at 2.

[55] Tr. 246:9–23.

[56] Tr. 246:24–247:9.

[57] Tr. 248:1–13.

[58] Ex. 19, at 2; Tr. 248:14–19.

[59] Ex. 19, at 2.

liabilities,[60] but LNG still ended January 2020 with a negative $35,168.62 balance in its bank account.[61] This loan was in addition to another $50,000 Mr. Dilger had loaned to LNG in 2019.[62] Because of the ongoing financial issues, Mr. Dilger began to inquire into LNG's finances.[63] Mr. Dilger reviewed the budget prepared by Mr. Van Tassel and discovered several expenses from 2019 that he believed were excessive.[64] Mr. Dilger confronted Ms. Sabin about his concerns.[65] Mr. Dilger became upset when he learned the Sabins were profiting from the rent LNG was paying for the new building.[66] He also told Ms. Sabin he believed many of the other expenses were not business expenses at all but were Ms. Sabin's personal expenses.[67] Soon after the confrontation, Ms. Sabin began reviewing the Quickbooks records and recategorizing various expenses from business expenses to personal expenses, which were added to her loan.[68]

To get LNG's financials back on track, Plaintiffs removed Ms. Sabin's access to LNG's bank accounts.[69] Plaintiffs also established some financial controls with which Ms. Sabin would have to comply.[70] Ms. Sabin believed the financial controls were too restrictive, but she did comply with them.[71] Plaintiffs took all the money from LNG's checking account at Zion's Bank

---

[60] Tr. 46:8–21; 318:22–319:4.

[61] Ex. 17, at 1.

[62] Tr. 53:7–25.

[63] Tr. 319:2–4.

[64] Tr. 320:11–323:1.

[65] Tr. 327:7–11.

[66] Tr. 88:3–6; 325:20–326:25.

[67] Tr. 323:18–324:7.

[68] Tr. 158:24–159:3; 327:7–10; 362:10–12.

[69] Tr. 62:12–63:2.

[70] Tr. 60:22–61:5.

[71] Tr. 61:4–5; 78:13–15; 155:8–12; 156:17–24.

and transferred it to another account it had with Comerica. This caused numerous payments to bounce, including LNG's payroll.[72] Plaintiffs also removed Ms. Sabin's access to the Comerica account and the American Express account.[73] When Ms. Sabin requested access, they gave her read-only access to the Comerica account.[74] Plaintiffs never restored Ms. Sabin's access to the American Express account[75] even though that access was necessary to do proper bookkeeping.[76]

In response, Ms. Sabin removed Plaintiffs' ability to access the Quickbooks account because she was worried Plaintiffs would make changes to make it look like she was stealing money from the company.[77] Ms. Sabin wanted to provide Plaintiffs with read-only access, but she could not figure out how to set that up.[78] And even though Plaintiffs did not have access to the Quickbooks, Ms. Sabin continued to adhere to their financial controls.[79]

Because of the strained relationship among the owners, Ms. Sabin offered to sell her 40% interest in LNG to Mr. Armstrong's father, Mike Armstrong, for $3,500,000.[80] Mr. Van Tassell worked with Ms. Sabin to evaluate LNG and come up with the offer amount,[81] which was based on LNG's audited financial statement from 2018.[82] No one responded to Ms. Sabin's offer.[83]

---

[72] Tr. 58:3–13.

[73] Tr. 57:21–25; 353:17–18.

[74] Tr. 353:19–25.

[75] *Id.*

[76] Tr. 162:16–22.

[77] Tr. 62:14–20; 63:10–23.

[78] Tr. 63:17–23.

[79] *See* Tr. 63:3–9.

[80] Ex. 12; Tr. 65:12–66:8; 208:14–18.

[81] Tr. 250:20–23.

[82] Tr. 252:5–7.

[83] Tr. 66:22–67:6; 351:23–352:6.

In March, Ms. Sabin decided to change Rejuvica's pricing and payment terms to be consistent with other customers so that LNG could recover from its financial crisis.[84] As owners of Rejuvica, Plaintiffs did not approve of Ms. Sabin's unilateral decision.[85] Either because of the new terms or the apparent dysfunction of LNG, Rejuvica sought out a new manufacturer in early March 2020.[86] However, Rejuvica continued placing orders with LNG throughout March 2020, and LNG began purchasing the materials and manufacturing the products.[87] Rejuvica ultimately moved to a new manufacturer sometime in March 2020, leaving LNG with hundreds of thousands of dollars of unpaid orders and products and materials it cannot sell.[88]

In the beginning of April 2020, Plaintiffs emptied LNG's bank accounts of approximately $300,000.[89] They used a couple hundred thousand dollars to pay off LNG's American Express card and $60,000 to partially pay Mr. Dilger for the loans he made to LNG.[90] Again, this left LNG unable to pay its payroll, and LNG was forced to rely solely on accounts receivable.[91]

## 2. Shutting Down LNG

On April 8, 2020, Plaintiffs sent a private investigator to post a sign on LNG's door with the following information:

> To the employees of Liquid Nutra Group,
>
> Due to lack of funding, the majority members of Liquid Herbals Manufacturing, LLC d/b/a Liquid Nutra Group ("LNG") have determined to lay off all employees

---

[84] Tr. 48:1–53:6; 98:10–22.

[85] Tr. 52:15–16.

[86] Tr. 333:12–334:14.

[87] Tr. 98:20–99:4.

[88] Tr. 96:18–98:9; Ex. 35, at 1–2.

[89] *See* Ex. 27; Tr. 381:14–382:6.

[90] Tr. 100:21–101:3; 380:19–383:5.

[91] Ex. 63.

at the Vernal, Utah location. This results in the immediate termination of you as part of a reduction in force. Please be advised that any work you do notwithstanding this notice will be at your own risk and will not be compensated. If you have any questions, you are welcome to contact Kyle Dilger at kdilger@liquidnutragroup.com.[92]

Plaintiffs also turned off LNG employees' access to their emails, including Ms. Sabin's email.[93]

That same day, Plaintiffs' attorneys sent a letter to Ms. Sabin's attorney stating that Plaintiffs had

> assessed the business of the company and its capitalization as a whole. Based on the information available to them, they do not believe the company is sufficiently capitalized to continue to employ the other employees at the Vernal, Utah facility due primarily to Ms. Sabin's actions. Therefore, [Plaintiffs], as the majority members of the company, have determined to lay off the remaining employees due to lack of funds. This results in the immediate termination of the remaining employees as part of a reduction in force.
> . . .
> Under the circumstances [Plaintiffs] believe it is not reasonably practicable to carry on the company's activities and affairs due to the dispute between our respective clients described herein and in my February 14 letter. We believe the appropriate course of action is to dissolve the company and wind up its affairs. Please let me know by 6:00 p.m. on Thursday, April 9, if your client will consent to the dissolution of the company to be administered by my clients. If your client will not consent to this, my clients will seek dissolution in court pursuant to Utah Act § 48-3a-701(4) and (5).[94]

Plaintiffs suggest that they did not intend to permanently shut down LNG on April 8 and that they took these actions to force Ms. Sabin to come to the table to figure out how to keep LNG running.[95] However, the Court finds that Plaintiffs intended to permanently shut down LNG on April 8, 2020, when they fired all of LNG's employees, removed access to all email accounts, and told Ms. Sabin they would seek dissolution in court if she would not agree to it.

---

[92] Ex. 31; Tr. 355:16–356:20.

[93] Tr. 106:24–107:1.

[94] Ex. 15.

[95] Tr. 374:22; 375:23–376:24; 378:19–24.

3. Uintah Basin Herbals

On April 8, the Sabins, with the help of several of LNG's former employees, began moving LNG's equipment, products, and materials to the new building LNG rented from Uintah Basin Holdings.[96] Ms. Sabin carefully kept track of the equipment and materials they took from LNG's old building and what they left there.[97] That day, Mr. Sabin began the process to create a new company called Uintah Basin Herbals, LLC ("Herbals").

On April 13, 2020, Mr. Sabin registered Herbals, and he is the sole member.[98] Ms. Sabin began working as an employee at Herbals.[99] Many of LNG's employees also began working for Herbals.[100] At first, Herbals fulfilled many of the obligations LNG had to its customers, employees, and creditors.[101] Herbals completed the outstanding orders, and Ms. Sabin paid LNG's obligations with money received from completing these orders. When the existing orders were completed, Ms. Sabin told LNG's customers that LNG could not take new orders and that the customers could either contact Herbals to place orders or find another manufacturer.[102] On April 20, 2020, Herbals began taking new orders from some of LNG's former customers.[103]

As Herbals continued to operate, Ms. Sabin kept track of the raw materials and equipment obtained from LNG that Herbals used and did not use.[104] Herbals has used and is

---

[96] Tr. 91:22–92:6.

[97] Ex. 67; Tr. 92:13–93:24; 94:8–96:8.

[98] Ex. 132.

[99] *See* Tr. 270:3.

[100] Tr. 108:18–22.

[101] Tr. 211:24–25.

[102] Tr. 93:25–94:3; 107:4–10.

[103] Tr. 214:21–25.

[104] Tr. 92:13–93:24; 94:8–96:8.

using a significant portion of LNG's equipment and some of its raw materials, but Herbals has also stored significant amounts of LNG's materials that are not needed for Herbals's current customers.[105] Herbals also continues to store approximately $800,000 worth of Rejuvica's products and ingredients that neither Herbals nor LNG can sell or use for other customers.[106] Rejuvica has not paid for these products despite ordering them in March 2020.[107]

After LNG's money ran out, Herbals continued to pay all of LNG's bills, including the Cedar Bear settlement payment.[108] Like with the equipment and materials, Ms. Sabin kept detailed records of which of LNG's debts were paid by Herbals and which were paid by LNG.[109] As of May 2021, Herbals had paid approximately $350,000 of LNG's bills.[110] Herbals retained a majority of LNG's employees and LNG's non-Rejuvica customers.[111] Herbals also expanded its business to include a fulfillment operation that LNG did not have.[112]

Herbals is still operating today. About 80% of Herbals's customers are LNG's former customers, and 20% of its employees are LNG's former employees.[113]

---

[105] Tr. 95:1–12.

[106] Tr. 96:18–99:8.

[107] Tr. 98:11–22.

[108] Tr. 101:22–102:5.

[109] Ex. 88; Tr. 103:6–104:6.

[110] Tr. 103:3–5.

[111] Tr. 108:18–109:2; 284:8–18; 548:8–11.

[112] Tr. 114:17–115:13.

[113] Tr. 108:18–109:2.

4. This Lawsuit

Plaintiffs filed this lawsuit seeking dissolution pursuant to Utah Code Ann. § 48-3a-701

on April 17, 2020.[114] On July 16, 2020, Ms. Sabin submitted a notice of her election to purchase

Plaintiffs' interests in LNG in lieu of dissolution pursuant to Utah Code Ann. § 48-3a-702.[115]

The parties were not able to come to an agreement about the fair market value of Plaintiffs'

interests in LNG within 60 days, so they submitted a stipulated motion to stay the proceedings

and determine the value of Plaintiffs' interests, as provided in § 48-3a-702(8).[116] The Court held

a valuation hearing on May 3–5, 2021, and the parties submitted their post-hearing briefs on July

1, 2021.[117] The issue of valuation is ready for determination.

## II.      DISCUSSION

Under Utah Code Ann. § 48-3a-702(8),

> [i]f the parties are unable to reach an agreement as provided for in Subsection (7),
> upon application of any party, the district court shall stay the proceedings under
> Subsection 48-3a-701(5) and determine the fair market value of the applicant
> member's interest in the limited liability company as of the day before the date on
> which the petition under Subsection 48-3a-701(5) was filed or as of any other date
> the district court determines to be appropriate under the circumstances and based
> on the factors the district court determines to be appropriate.

Under this section, the Court must determine (A) the appropriate valuation date, (B) the fair

market value of Plaintiffs' 30% interests on that date, and (C) reasonable terms for payment.

Plaintiffs also request (D) attorney's fees.

---

[114] Docket No. 2.

[115] Docket No. 19.

[116] Docket No. 21.

[117] Docket Nos. 101 & 104.

A. Valuation Date

Under Utah Code Ann. §48-3a-702(8), the Court has discretion to determine the valuation date when considering the circumstances and factors the Court deems appropriate. Ms. Sabin argues the Court should value LNG on April 16, 2020, because that is the date stated in the statute and because Plaintiffs should not get paid for their interests in a fully functioning company after Plaintiffs diverted LNG's biggest customer and shut LNG down. On the other hand, Plaintiffs argue that the appropriate valuation date is December 31, 2019, because that was the end of the year just prior to Mr. Dilger discovering Ms. Sabin had continued to make personal expenditures and prior to Ms. Sabin's other alleged bad acts.

Plaintiffs' argument is not persuasive because many of the acts Plaintiffs complain about occurred before December 31, 2019. For instance, Ms. Sabin used LNG's debit and credit cards to make personal expenditures consistently from 2017 through 2019. This was not new, and it would not have devalued LNG more after December 31, 2019, just because Mr. Dilger discovered it. Plaintiffs complain that the rent for the new building devalued LNG. However, those rent payments began in December 2019 and would be included in a December 31 valuation. Plaintiffs also complain about Ms. Sabin using a loan from Mr. Dilger to pay a Cedar Bear payment in 2019 when the loan was intended for purchasing equipment for LNG. This would also be priced into a December 31 valuation. Further, Ms. Sabin's alleged threats to shut down LNG, without action, would not have devalued LNG. Indeed, Plaintiffs' argument that Ms. Sabin's threats to shut down LNG devalued LNG is especially remarkable when considering the negative effect Plaintiffs' decision to actually shut LNG down had on its value.

Surely, Ms. Sabin acted in ways that devalued LNG, but the Court cannot ignore Plaintiffs' part. Plaintiffs removed LNG's largest customer and shut down LNG in March and

April of 2020, respectively. Both of these actions significantly lowered LNG's value after December 31, 2019. Plaintiffs' proposed valuation date would allow Plaintiffs to avoid the consequences of their own actions, which would not be equitable. The Court finds that the most equitable valuation date is April 16, 2020 because it captures the fruits of both parties' actions.

B. Fair Market Value of Each of Plaintiffs' 30% Interests

The governing statute has not defined "fair market value," but the definition in the International Glossary of Business Terms is

> the price, expressed in terms of cash equivalents at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms' length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[118]

This is consistent with the definition in other portions of the Utah Code.[119] Thus, the Court will apply this general standard.

Ms. Sabin argues that the fair market value of Plaintiffs' 30% interests in LNG on April 16, 2020, is $140,000 each. Plaintiffs argue it is $2,314,000 each. The differences between these values are a result of the differences in (1) the projections used and (2) the discounts applied.

1. Projections

Both parties' experts relied on the discounted cash flow method to determine the income value of LNG. The Court finds that this is an appropriate method of valuation because it assumes that LNG would continue operating. The evidence shows that LNG could have rehired its employees and continued operating as of April 16, 2020. The discounted cash flow method relies

---

[118] Tr. 493:10–22.

[119] *See* Utah Code Ann. § 59-2-102(13)(a).

heavily on projections of revenue, cost of goods sold, and operating expenses to estimate future cash flow.[120] The projections and calculations will be discussed below.

    a.   Revenue Projections

    To project future revenue, Ms. Sabin's expert, Mr. Connors, relied on a budget prepared on April 12, 2020, projecting $1,989,000 in revenue from April 2020 through March 2021.[121] This is about a 21.66% increase from LNG's 2019 non-Rejuvica revenue. Then, Mr. Connors projected revenue increases of 10%, 5%, 3%, and 2.6% for the following four years. On the other hand, Plaintiffs' expert, Mr. Rasmussen, estimated LNG's non-Rejuvica revenue in 2020 would be $3,554,394, nearly 118% more than LNG's non-Rejuvica revenue in 2019. In the following four years, Mr. Rasmussen estimated increases of approximately 34.83%, 26.09%, 20.07%, and 13.86%. Mr. Rasmussen based these projections on discussions with Plaintiffs about LNG's potential revenue in preparation for this litigation.[122]

    In addition to the experts' projections, there are other pieces of evidence with revenue projections. On January 8, 2020, Mr. Armstrong emailed Ms. Sabin and Mr. Dilger a draft sales plan for 2020.[123] This sales plan shows that LNG had a conservative goal of reaching $2,000,000 in revenue in 2020, excluding revenue from LNG's two largest customers, Rejuvica and Nardia.[124] The next day, Mr. Van Tassell prepared a draft 2020 budget. This budget projected $2,834,914 in non-Rejuvica revenue.[125] There are also two draft budgets that are both dated

---

[120] *See* Rasmussen Report, at 14.

[121] Tr. 498:13–16.

[122] Tr. 550:23–551:8.

[123] Ex. 13, at 1.

[124] *Id.*

[125] *See* Ex. 19, at 1.

April 12, 2020.[126] Because of the circumstances, both budgets estimate April 2020–March 2021 revenue and exclude Rejuvica entirely. One estimates $1,989,000 in revenue,[127] and the other estimates $2,452,000 in revenue.[128]

The Court finds that the best 2020 revenue projection as of April 16, 2020, is $2,452,000, which is found on one of the budgets prepared on April 12, 2020. This projection is roughly consistent with the projections from the sales plan and draft budget prepared in January 2020. However, it is lower than those earlier projections because it takes into account the events on April 8, 2020, and the uncertainty LNG was experiencing as of April 16. This projected revenue also shows a strong 50% growth from LNG's 2019 non-Rejuvica revenue, which is consistent with LNG's non-Rejuvica growth in the prior years. In its best year, LNG's actual non-Rejuvica revenue grew by approximately $700,000. If LNG's non-Rejuvica revenue grew by another $700,000 in 2020, that would be a growth of 42%. Thus, the 50% growth projection would suggest LNG had another good year of growth. This projection is also appropriate because it would have been known or knowable to a hypothetical buyer as of the valuation date.

The experts both projected that LNG's growth would slow each year going forward, but their estimates are widely different. Mr. Connors projected small amounts of growth and Mr. Rasmussen projected large growth. There are facts in evidence to support both views. For instance, there is evidence that the liquid herbal supplement industry is expected to grow more rapidly in the coming years because of an aging population and the general focus on health.[129] Plaintiffs also acknowledged that the industry enjoyed unusual growth during the COVID-19

---

[126] Exs. 93, 94.

[127] Ex. 93.

[128] Ex. 94.

[129] Connors Report, at 10.

pandemic, which was ongoing at the time of the valuation date.[130] However, LNG's non-Rejuvica business did not grow extremely fast from 2016–2019, and its growth may have been slowed because of the dysfunction among the members in 2020.

Because of these opposing factors, the Court will rely upon the averages of the experts' projected growth for each of the following four years. Mr. Connors projects LNG would grow by 10% in 2021, and Mr. Rasmussen estimates LNG would grow by 34.83% in that same year. The average of these two growth projections is 22.42%. Thus, the Court's 2020 projection of $2,452,000 will increase by 22.42% to equal $3,001,738 in projected revenue for 2021. Following the same process for the remaining years, the Court's revenue projections for LNG from 2020–2024 are shown below:

| Year | Revenue Projection |
|------|--------------------|
| 2020 | $2,452,000 |
| 2021 | $3,001,738 |
| 2022 | $3,468,509 |
| 2023 | $3,868,775 |
| 2024 | $4,187,175 |

b.  Cost of Goods Sold

The next point of disagreement is the projected cost of goods sold ("COGS") for LNG's non-Rejuvica customers. The COGS represents the direct cost of producing the product. In this case, the COGS is expressed as a ratio of how much the products cost to make compared to how

---

[130] Tr. 415:7–11.

much customers pay for them. LNG charged Rejuvica lower rates than it charged other non-Rejuvica customers, but it did not keep track of its costs per customer. Because of this, the existing financial data for LNG does not show what LNG's COGS would be without Rejuvica. This presented a problem for the experts, and they both used different methods to calculate the applicable COGS.

Mr. Connors projected that LNG's COGS would be 38.12%. This means that LNG would expect to make a net profit of 61.88 cents for every dollar of gross revenue. Mr. Connors calculated this COGS by adjusting Rejuvica's past revenue up to what Rejuvica would have paid for products if it had been paying market rates.[131] Then, he used LNG's actual costs, which are assumed to be at market rates, and divided by Rejuvica's adjusted revenue to calculate the COGS LNG would have had if Rejuvica had been paying market rates.[132] This shows the market rate COGS and would be similar to what LNG's COGS would be without Rejuvica.

Mr. Rasmussen came up with a much lower COGS by using Herbals's COGS as LNG's non-Rejuvica COGS.[133] He explained that Herbals had nearly the same customer base as LNG, excluding Rejuvica, which means Herbals's COGS would be very close to what LNG's COGS would have been for non-Rejuvica customers.[134]

Ms. Sabin complains that Mr. Rasmussen's method is improper because it takes into account events that occurred after the valuation date, and that information would not have been known or knowable on April 16, 2020. Thus, a hypothetical buyer calculating the fair market value of LNG as of April 16, 2020, would not have been able to use Herbals' COGS in his or her

---

[131] Tr. 504:1–505:14.

[132] *Id.*

[133] Rasmussen Report, at 30.

[134] *Id.*

calculations. The Court finds Mr. Connors' calculation to be the most accurate and most persuasive because it relies on data that was known or knowable as of the valuation date.

However, Mr. Connors COGS is not comparable to Mr. Rasmussen's COGS because Mr. Connors included the cost of the labor required to manufacture the products and Mr. Rasmussen did not.[135] The cost of labor was included in Mr. Rasmussen's operating expenses instead. This means Mr. Rasmussen projected lower COGS and higher operating expenses. Mr. Rasmussen provided detailed line items for the COGS and the operating expenses and Mr. Connors did not. The Court will apply Mr. Connors' method to Mr. Rasmussen's historical income statements[136] to calculate LNG's COGS without Rejuvica. This will ensure that there is no double counting or undercounting any of the costs or operating expenses. After making these adjustments, the average COGS ratio from 2016 to 2019 is 29.3%.

To determine LNG's projected gross profit, the Court will take LNG's projected revenue and subtract the COGS of 29.3%.

| Year | Revenue Projection | COGS | Gross Profit |
|------|--------------------|------|--------------|
| 2020 | $2,452,000 | $718,436 | $1,733,564 |
| 2021 | $3,001,738 | $879,509 | $2,122,229 |
| 2022 | $3,468,509 | $1,016,273 | $2,452,236 |
| 2023 | $3,868,775 | $1,133,551 | $2,735,224 |
| 2024 | $4,187,175 | $1,226,842 | $2,960,333 |

---

[135] Tr. 602:2–9.

[136] *See* Rasmussen Report, schedule 16.

c.  Expense Projections

Next, the experts projected LNG's operating expenses. Mr. Connors estimated LNG's operating expenses based on the observed historical operating expenses for LNG, excluding some of the expenses Plaintiffs disputed and excluding expenses identified as perks. Mr. Connors projected all salaries as variable salaries that would increase at the same rate as the revenue.

Like Mr. Connors, Mr. Rasmussen relied on the historical operating expenses. He excluded all of the disputed expenses and nonessential expenses from the calculations. He separately calculated salaries for employees with fixed salaries and employees with variable salaries like commissions. He increased the fixed salaries by 10% each year. He also adjusted for non-recurring expenses such as the attorneys' fees related to the Cedar Bear litigation.

The Court finds Mr. Rasmussen's detailed calculations are the most accurate projections for operating expenses, but the Court will adjust for the lower revenue projected by the Court.

To calculate net profit, the projected income taxes must also be considered. Both experts calculated the income taxes to be 25% of the gross profit minus the operating expenses and the depreciation and amortization. The Court will rely on the average of the experts' projected depreciation and amortization to make these calculations. The following table shows the projected operating expenses, depreciation and amortization, and income taxes, resulting in LNG's projected net profit from 2020 through 2024:

|  | Gross Profit | Expenses | Depreciation and Amortization | Income Taxes | Net Profit |
|---|---|---|---|---|---|
| 2020 | $1,733,564 | $1,597,668 | $35,407 | $25,122 | $75,367 |
| 2021 | $2,122,229 | $1,654,207 | $40,986 | $106,759 | $320,277 |

| 2022 | $2,452,236 | $1,851,774 | $46,779 | $138,421 | $415,262 |
| 2023 | $2,735,224 | $2,118,028 | $21,857 | $148,835 | $446,504 |
| 2024 | $2,960,333 | $2,299,263 | $27,850 | $158,305 | $474,915 |

d.   Fair Market Value Conclusion

The experts projected LNG's cash flow for each year by taking the net profit, adding the depreciation and amortization back in, and subtracting capital expenditures. After adding the depreciation and amortization, subtracting the averages of the expert's projected capital expenditures, and subtracting the Cedar Bear payments in 2020, 2021, and 2022, the table below displays the projected cash flow:

|      | Projected Cash Flow |
| --- | --- |
| 2020 | -$185,726 |
| 2021 | $82,063 |
| 2022 | $176,891 |
| 2023 | $437,611 |
| 2024 | $471,465 |

With the projected future cash flow calculation, the Court computes the fair market value of LNG as of April 16, 2020, by determining the enterprise value of LNG. The enterprise value consists of adding together the present value of the projected cash flow for 2020–2023 with the present value of the terminal value of LNG, as described below.

First, the present value of projected cash flow represents what future cash flow is worth in today's dollars. This is calculated by multiplying the projected cash flow by a present value

discount factor. The present value discount factor adjusts for events that devalue money over time, such as inflation. The experts had similar present value discount factors, so the Court will use those approximate values. The 2020 cash flow is also reduced by about 30% because it is accounting for approximately 70% of a year from April 17, 2020 through December 31, 2020. Then, the projections from 2020–2023 are added up to calculate the total present value of available cash flow. The result of these calculations is shown below:

| Year | Projected Cash Flow | Partial Period Adjustment | Present Value Factor | Present Value of Projected Cash Flow |
| --- | --- | --- | --- | --- |
| 2020 | -$185,726 | 0.7 | 0.928 | -$120,648 |
| 2021 | $82,063 | 1.0 | 0.76 | $62,368 |
| 2022 | $176,891 | 1.0 | 0.615 | $108,788 |
| 2023 | $437,611 | 1.0 | 0.5 | $218,805 |
| **Total** | | | | **$269,313** |

Second, the terminal value estimates what LNG's value is beyond the forecasted period. This is accomplished by taking the projected cash flow from 2024 and dividing it by the capitalization rate. The parties had very similar capitalization rates, so the Court's calculation is as follows:

Terminal value = $471,465/.205 = $2,299,828

The present value of the terminal value is calculated by multiplying the terminal value by the present value factor for 2024. The experts had present value factors of 0.4182 and 0.3918, so the Court will apply a discount factor of 0.4. Thus, the present value of the terminal value is $2,299,828 x 0.4 = $919,931.

Finally, the enterprise value is the present value of available cash flow plus the present value of the terminal value. This results in a total enterprise value of $269,313 + $919,931 = $1,189,244. This is the value of 100% of LNG. Thus a 30% interest is $1,189,244 x 0.3 = $356,773.

2.  Discounts

Typically, fair market values for non-controlling interests include discounts for lack of control and lack of marketability.[137] Mr. Connors included these discounts in his analysis. However, Plaintiffs argue that the Court should not apply these discounts because (1) Ms. Sabin is purchasing two 30% interests and therefore is purchasing a controlling 60% interest in LNG and (2) Ms. Sabin allegedly oppressed Plaintiffs by locking Plaintiffs out of LNG's Quickbooks account and by unilaterally changing the pricing and terms that applied to Rejuvica's orders.

The Court is not persuaded by Plaintiffs' argument that the Court should view their individual 30% interests as one 60% interest. The fair market value standard requires the Court to consider what separate hypothetical buyers would pay for each Plaintiff's interest. To conclude otherwise would implement a different standard such as investment value, which considers who is buying the interests and the value to that specific person. The Court's conclusion is also supported by Plaintiffs' expert. Mr. Rasmussen did not analyze one 60% interest in LNG; he analyzed two separate 30% interests in LNG.[138]

The Court is also not persuaded by Plaintiffs' argument that Ms. Sabin oppressed them. Based on the evidence presented at the hearing, Ms. Sabin locked Plaintiffs out of the Quickbooks out of fear that they would alter the categories for her personal expenses. She

---

[137] Tr. 494:19–24; 545:10–12.

[138] Rasmussen Report, at 2–3 (calculating the value of two separate 30% interests in LNG).

testified that she tried to give them read-only access but was unable to figure out how to do that. This action and the fact that Ms. Sabin is not tech-savvy does not rise to the level of oppression. But even if it did, Plaintiffs engaged in similarly oppressive conduct when they locked Ms. Sabin out of LNG's bank accounts during the same time period. If both sides acted oppressively, it is not equitable to exclude discounts and allow Plaintiffs to benefit from their own oppression.

Likewise, Ms. Sabin's unilateral decisions regarding Rejuvica cannot constitute shareholder oppression. Plaintiffs acknowledge that, together, they hold a 60% majority interest in LNG. This means that they could have easily held a vote about how to proceed with Rejuvica and overcome any objection by Ms. Sabin. They did not. Ms. Sabin was not oppressing Plaintiffs by making changes that Plaintiffs could have easily overturned.

Thus, there is no basis—legal or equitable—to exclude the discounts typical of a fair market value analysis. The Court will rely on Mr. Connor's suggestion for discounts: a 20% discount for lack of control and a 25% discount for lack of marketability. Mr. Connors first subtracted the 20% discount from the full amount, then he subtracted 25% from the amount remaining after the 20% discount. The Court will do the same, as shown in the table below:

| | |
|---|---|
| Total enterprise value | $1,189,244 |
| 30% interest | $356,773 |
| -20% of $356,773 | -$71,355 |
| -25% of $285,418 | -$71,355 |
| **30% interest with discounts** | **$214,063** |

Thus, the fair market value of each 30% interest in LNG is $214,063.

Additional reductions for lack of capital are not necessary because LNG had over $1,000,000 in accounts receivable as of April 16, including the loan Ms. Sabin owes and the money Rejuvica owes to LNG. This would have been sufficient to fund LNG as of April 16, 2020.

C. Reasonable Terms

Utah Code Ann. § 48-3a-702(9) states the following: "Upon determining the fair market value of the interest in the limited liability company of the applicant member, the district court shall enter an order directing the purchase of the interest in the limited liability company upon terms and conditions the district court determines to be appropriate. The terms and conditions may include payment of the purchase price in installments . . . ." Ms. Sabin requests that she be given one year to pay $140,000 for each Plaintiff's 30% interest with interest accruing at the federal post-judgment rate. If the Court finds a greater fair market value, she requests the payment term be extended accordingly.

The Court finds that these terms are reasonable. The Court will require Ms. Sabin to pay Plaintiffs $214,063 each for their interests within 24 months of the date of the Court's order with interest accruing at the federal post-judgment rate.

D. Attorney's Fees

Plaintiffs argue for the first time in their post-hearing brief that the Court should award attorneys' fees under Utah Code Ann. § 48-3a-702(12). This section provides that "[i]f the district court finds that the applicant member had probable ground for relief under Subsection 48-3a-701(5), the district court may award to the applicant member reasonable fees and expenses of counsel and experts employed by the applicant member." And subsection 48-3a-701(5) allows for dissolution when the managers or members in control of the LLC "have acted . . . in a manner

that is illegal or fraudulent" or "have acted . . . in a manner that is oppressive and was, is, or will be directly harmful to the applicant."

Plaintiffs had ample opportunities to give the Court and Defendants notice that they would be seeking attorneys' fees in this matter. But they did not mention it in their pre-hearing brief[139] or at any time during the three days of the evidentiary hearing.[140] Instead, Plaintiffs delayed their request until the last possible moment in their post-hearing brief when Defendants would not have an opportunity to respond to the attorneys' fees argument. And importantly, the attorneys' fees request is the only relevant section that requires the Court to look at the merits underlying the dissolution case. Neither the Court nor Defendants were on notice at the hearing that the Court would be asked to evaluate the merits of the dissolution. This procedure for requesting attorneys' fees is entirely inappropriate.

Furthermore, as described above, the Court does not find that Ms. Sabin oppressed Plaintiffs. And although Ms. Sabin may have acted poorly by charging personal expenses to LNG's card, she did eventually categorize them as personal expenses and add them to her loan. There is not sufficient evidence to show that she acted illegally or fraudulently. For these reasons, the Court will deny Plaintiffs' request for attorneys' fees.

III.    CONCLUSION

It is therefore

ORDERED that Ms. Sabin pay $214,063 for Mr. Armstrong's 30% interest in LNG and $214,063 for Mr. Dilger's 30% interest in LNG within 24 months of the date of this order and with interest accruing at the federal post-judgment rate.

---

[139] *See* Docket No. 64.

[140] *See* Tr. 1–606.

The Court further

DENIES Plaintiffs' request for attorney's fees.

The Court further

GRANTS the parties' Motions to Seal (Docket Nos. 102, 105, 109, and 110)

DATED  August 6, 2021.

BY THE COURT:

_____

TED STEWART
United States District Judge